UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
APRIL KLEIN,

                 Plaintiff,

          -against-                                         07 Civ. 0160 (LAK)

NEW YORK UNIVERSITY,

                 Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION
### (Corrected)

          Appearances:

                         Robert T. Vance Jr
                         LAW OFFICES OF ROBERT T. VANCE JR
                         *Attorney for Plaintiff*

                         Rory J. McEvoy
                         Rachel B. Jacobson
                         EDWARDS ANGELL PALMER & DODGE LLP
                         *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

         Plaintiff April Klein brings this action for employment discrimination under Title

VII[1] and the Equal Pay Act ("EPA")[2] against New York University ("NYU"), where she is a

professor in the department of accounting, taxation and business law at the Leonard N. Stern School

---

[1] 42 U.S.C. §§ 2000e, *et seq*.

[2] 29 U.S.C. § 206(d)(1).

of Business ("Stern").  She alleges that NYU (1) did not promote her to the rank of professor as quickly as it should have because of her gender, (2) discriminated against her in other respects on the same basis, and (3) retaliated against her for, among other things, signing a 1998 memorandum regarding alleged gender discrimination at Stern.  NYU moves for summary judgment dismissing the complaint.

*Facts*

I.      *Plaintiff's Employment at NYU*

Stern offers undergraduate and graduate programs in business and management education.[3]  Its faculty includes assistant professors, clinical professors, associate professors, and professors.[4]  In 1987, it hired Klein as a visiting assistant professor in the accounting department at Stern.[5]

Klein accepted a full-time tenure track assistant professor position at Stern in 1989.[6] She was promoted to associate professor effective September 1, 1992 and received tenure effective September 1, 1993.[7]

---

[3]      Choi Decl. [DI 43] ¶ 3.

[4]      Walter Decl. [DI 46] ¶ 3; Pl. Decl. [DI 52] ¶ 1.

The NYU Faculty Handbook describes in detail the differences and requirements for each faculty rank.  Vance Decl. [DI 53] Ex. 1 at 22-25.

[5]      Pl. Dep. [DI 42] , at 8:22-9:8.

[6]      Pl. Dep., at 10:12-16.

[7]      *Id.* at 11:12-16, Ex. 1.

*II.     The 1998 Memorandum*

On September 14, 1998, Klein and other female members of the Stern faculty signed a memorandum titled "Representation of Women Faculty at the Stern School of Business" (the "1998 Memo") regarding alleged gender discrimination at Stern.[8]  Ten of the eleven faculty members who signed it were tenured at the time, and the other was a long-time clinical professor. The group sent the 1998 Memo to George Daly, then the dean of Stern, and David Backus, then the vice dean of faculty.  Daly and Backus later met with the signers.  Theresa Lant, an associate professor, was the principal spokesperson for the group.[9]

Following the 1998 Memo, Stern formed the Committee on the Role and Status of Women Faculty (the "Women's Committee").  The Women's Committee met periodically from September 1999 to April 2001.  In April 2001, it published a report finding that female faculty members were: (1) "less satisfied with the work environment at Stern," (2) "less likely to report that they were treated with respect, that their ideas were valued, or that they had effective networks of support," and (3) mostly underpaid relative to male faculty members from 1999-2000 based on total compensation.[10]  The report recommended equity in tenure and promotions.

More than half of the female faculty members who signed the 1998 Memo, including

_____

[8]

Pl. Dep., at 57:19-23, Ex. 7.

[9]

Pl. Decl. ¶ 6.

Lant later sought and was denied promotion and resigned in August 2008.  *Id.* ¶ 6, Walter Decl. ¶ 14, Ex. 17.

[10]

 Vance Decl. Ex. 6; Am. Cpt. [DI 6] ¶ 13.

4

Klein, who was promoted to full professor in December 2009,[11] still are employed at NYU, including:[12]

- Kim Corfman, professor of marketing, was promoted to full professor after signing the 1998 Memo.[13]  Corfman has served as the associate dean of academic programs and academic director of the Langone program, and has been the vice dean for the MBA programs since 2004.[14]

- Halina Frydman, now professor of statistics and operations research, sought and was denied promotion twice after signing the 1998 Memo despite strong support from her department.[15] Ultimately, however, she was promoted to professor.[16]  She served also as coordinator for the undergraduate program in 2002 and 2003 and received a faculty fellowship.[17]

- Barbara Katz, professor of economics, was a full professor at the time that

_____

[11]

Pl. Decl. ¶ 6.

[12]

Of the other female faculty members who signed the 1998 memo and are no longer employed at NYU, Priscilla LaBarbera died in 2000.  Walter Decl. ¶ 14.  Rita Maldonado retired in 2004.  *Id.* ¶ 14, Ex. 15.  Christine Kelly, the only clinical professor who signed the 1998 Memo, was not reappointed after the 2002-2003 academic year.  *Id.* ¶ 14, Ex. 16.  Teresa John filed a grievance alleging gender and age discrimination with the Stern faculty grievance committee and a complaint alleging sex discrimination with the New York State Division of Human Rights in 2005.  Vance Decl. Ex. 7.  She resigned in 2008.  Walter Decl. Ex. 18.

[13]

Walter Decl. ¶ 6, 8.

[14]

*Id.* ¶ 9, Exs. 6-8.

[15]

Pl. Decl. ¶ 7.

[16]

Walter Decl. ¶ 6, 8.

[17]

Walter Decl. ¶ 13, Ex. 12.

she signed the 1998 Memo.[18]

- Frances Milliken, now professor of management and organizations, was promoted to full professor after signing the 1998 Memo.[19]  She has served as the faculty director of Stern's Westchester program since 2009[20] and received a faculty fellowship.[21]

- Elizabeth Morrison, now professor of management and organizations, was promoted to professor.[22]  She served as chair of the management and organizations department, holds an endowed chair, and held a research professorship from 2001 to 2007.[23]

In addition to the promotions and other appointments described above, each of the female faculty members who signed the 1998 Memo and still is employed at Stern, including Klein, subsequently received annual summer research support.[24]

_____

[18]    *Id.* ¶ 7, Ex. 1.

[19]    *Id.* ¶ 6, 8.

[20]    *Id.* ¶ 10, Ex. 9; Pl. Decl. ¶ 8.

[21]    Walter Decl. ¶ 24, Ex. 37.

[22]    *Id.* ¶ 6, 8.

[23]    *Id.* ¶ 11, 23, 25, Exs. 10, 11, 35, 38.

[24]    *Id.* ¶ 14, Ex. 14.

6

III.   *Annual Faculty Review and Other Awards*

A.   *The Process*

Stern assesses the performance of faculty members each year during an annual faculty merit review.[25]  They are evaluated in three areas:  (1) research, (2) teaching, and (3) service and leadership.[26]  Half of an associate professor's overall rating is based on his or her research, including publication history, in the prior three years with more weight given to publications in top-tier journals.[27]  Teaching and service and leadership account for the remaining 30 percent and 20 percent, respectively, of the overall evaluation.[28]  A faculty member's teaching score is based solely on student course evaluations for the five previous semesters.[29]  Service and leadership are evaluated based on activities inside and outside of Stern for the previous two years.[30]

Each department has a "pool of money" available for merit raises.[31]  It is allocated in each department based on the annual faculty merit review.[32]  In the first instance, the department chair determines the raises based on the ratings and the funds available.  The faculty ratings and the

---

[25]

*Id.* ¶ 15.

[26]

Choi Decl. ¶ 7.

[27]

*Id.* ¶¶ 8, 9.

[28]

*Id.* ¶ 8.

[29]

*Id.* ¶ 10.

[30]

*Id.* ¶ 11.

[31]

Choi Dep. [DI 42-10], at 30:3-9.

[32]

Choi Dep., at 30:3-9.

chairs' allocations then are reviewed by the vice dean of faculty and the dean and finally approved by the provost.[33]

Faculty members are eligible also for additional financial support for research through a separate process. Every three years, the dean's office accepts nominations, including self-nominations, for research professorships and faculty fellowships from department chairs and other individuals.[34] A committee reviews the nominations and makes recommendations to the dean, who makes the final decisions.[35] Research professorships and faculty fellowships provide faculty with financial support of two-ninths of their base salary for a period of three years and are functionally equivalent.[36]

B.      *Klein's 2004-2005 Academic Year Merit Review*

On May 10, 2005, chair Backus completed Klein's faculty merit review for the 2004-2005 academic year. She received ratings of 4.5 for research, 1.5 for teaching, and 1.5 for service and leadership, which translated into an overall rating of 3.0.[37] The review mentioned two notable publications by her in 2002, two other submissions to top-tier journals, and an award from the American Accounting Association ("AAA"). The review, however, noted that Klein's teaching

---

[33]

 *Id.* at 30:10-31:4.

[34]

 Pl. Dep., Ex. 10.

[35]

 *Id.*

[36]

 *Id.*

[37]

 The maximum rating in each category was 5.0.

ratings were among the lowest, both in her department and at Stern, and that her service activities both inside and outside of the school were limited to a single committee at NASDAQ.  The review further described Klein's performance as "one of high variance" given Klein's "relatively small number of papers with above-average visibility" and her teaching record "consist[ing] of both very high ratings and . . . very low ones."  It urged Klein to put forth more consistent effort in her research and teaching, and observed that this could result in Klein's recognition as "one of the strongest members of the department."[38]

As a result of her faculty merit review, Klein received a three percent raise and summer research support, the equivalent of two-ninths of her base salary.[39]

C.      *Klein's 2005-2006 Academic Year Merit Review*

Backus completed Klein's faculty merit review for the 2005-2006 academic year on March 16, 2006.  She received ratings of 4.25 for research, 2.25 for teaching, and 3.5 for service and leadership, which gave her an overall rating of 3.4.  The evaluation referred to a notable publication in 2005, two other publications, and several working papers.  It recognized also her (1) improved teaching based on her student evaluations, although it noted that her average still remained in the bottom ten percent of the Stern faculty, and (2) additional service activities, including the faculty grievance committee, coordinating Petrovits's review, senior recruiting, several editorial boards, and a AAA committee.  The review summarized Klein's performance as:   "[s]trong research, solid

---

[38]

Pl. Dep., Ex. 50.

[39]

*Id.*

service, improving teaching."[40]  Klein received a 5.36 percent raise[41] and summer research support equal to two-ninths of her base salary.[42]  She continued to receive summer research support in subsequent years.[43]

D.     *Research Professorships and Faculty Fellowships*

In 2001, 2004, and 2007, Klein was nominated for a faculty fellowship but not selected by the dean.[44]  Other female faculty members, however, received research professorships or faculty fellowships in each of years in which Klein was nominated.[45]  When funding became available for fellowships in other areas, those fellowships were awarded to additional female faculty members but not Klein.[46]

IV.    *Promotion and Offers from Other Universities*

A candidate seeking promotion at Stern first must notify the department chair, who

---

40

   *Id.* Ex. 52.

41

   Walter Decl., Ex. 29.

42

   Pl. Dep., Ex. 52.

43

   In 2008, Klein received research support of one-ninth of her salary.  Pl. Dep., at 107:18-108:7.

44

   *Id.* at 77:7-79:20.

45

   Walter Decl. ¶¶ 23-25, Exs. 35-38.

46

   *Id.* ¶ 26, Exs. 39-40.

then appoints a committee to evaluate the candidate and make a recommendation to the department's promotion and tenure committee.[47]   After receiving the recommendation from the evaluation committee, the departmental promotion and tenure committee votes on whether to recommend the promotion.[48]  The dean's advisory committee on promotion and tenure then reviews the candidate and prepares a report and recommendation regarding the promotion and submits it to the dean.[49] The dean then makes a recommendation to the provost, who makes the final decision.[50]

In 2001, Klein applied for promotion to full professor along with two other accounting professors, Eli Bartov and Stephen Ryan.  Bartov was promoted.  Klein and Ryan were not.[51]

Four years later, Klein received an employment offer from Drexel University as a full professor running a newly established corporate governance institute and earning more than $200,000 per year.[52]  Klein met with Lee Sproull, the vice dean of faculty at the time, to discuss the offer.  Sproull advised Klein to take the offer and told her that NYU never would pay her market

---

[47]
      Choi Dep., at 10:20-11:15.

      A department chair may suggest that a candidate apply for promotion.  Pl. Decl. ¶ 12.

[48]
      Choi Dep., at 11:16-20; Pl. Dep., Ex. 2 at 9.

[49]
      Pl. Dep., Ex. 2 at 10.

[50]
      *Id.* Ex. 2 at 11.

[51]
      *Id.* at 33:7-25.

[52]
      *Id.* at 66:17-67:22.

value.[53]  Klein allegedly interpreted Sproull's advice regarding the Drexel offer as a request for her resignation.[54]

In April 2006, Klein filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").[55]  In December 2006, she filed a second charge.[56]  She brought this lawsuit in January 2007.

During the 2006-2007 academic year, the University of Delaware offered Klein a position as a full professor and research head of a corporate governance institute with a salary of more than $200,000.  She did not accept the offer or discuss it with anyone at Stern.[57]  In the same academic year, however, Klein told her department chair, Frederick Choi, that she wanted to be considered for promotion.[58]  Choi advised her to wait a year to apply because Ryan and another accounting professor, Paul Zarowin, would be applying for promotion in the same academic year.[59] Klein evidently took Choi's advice, as she did not then apply.  In January 2008, Choi asked Klein

---

[53]

*Id.* at 69:11-14.

[54]

*Id.* at 69:9-14, 20-23; 70:5-15.

[55]

Vance Decl. Ex. 3.

[56]

*Id.* Ex. 4.

[57]

Pl. Dep., at 73:9-25.

[58]

Pl. Decl. ¶ 13.

[59]

Pl. Dep., at 35:9-36:13; Choi Dep., at 19:13-20:3.

Zarowin and Ryan both began their promotion process while Backus was chair of the Department.  Pl. Decl. ¶ 14.

to submit the application materials required, and she did so.[60]  She was promoted to full professor on December 23, 2009, effective September 1, 2010.[61]

V.      *Other Aspects of Klein's Employment*

     A.      *Teaching Schedule*

        Alex Dontoh, associate professor and deputy chair of Klein's department, was responsible for assigning professors to teach courses after the entire schedule, including the specific courses and the days and times on which they would be taught, had been determined by the registrar's office.[62]  Faculty members, both female and male, objected to Dontoh's assignments.[63]  Dontoh, however, accommodated specific requests on certain occasions.  For example, when Klein asked Dontoh not to assign her to teach any early morning classes to allow her to take her children to school, Dontoh agreed not to do so.[64]

        During the 2005-2006 academic year, Klein was assigned to teach a course on financial accounting and reporting that was offered to MBA and non-MBA students.[65]  She was

---

[60]

    Pl. Dep., at 37:3-15.

[61]

    *Id.* at 39:21-40:25, Ex. 5.

[62]

    Dontoh Dep. [DI 42-12], at 12:20-14:3.

    His assignments were subject to approval by a committee of professors outside the department.  *Id.* 171:3-14.

[63]

    *Id.* at 21:14-25.

[64]

    Pl. Dep., at 184:2-9.

[65]

    *Id.* at 167:20-168:25.

unhappy with that aspect of her schedule because last minute changes were made to the course offering, including the timing of the class and the composition of the students.[66]

For the following academic year, Dontoh assigned Klein to teach an undergraduate accounting principles course and two MBA courses.[67]  It was the second time that Klein had been assigned to teach one of the MBA courses on a Thursday evening, and she took issue with that because she felt that it limited her ability to travel to present papers at other universities.[68]  She was dissatisfied with her teaching schedule also because she had (1) to prepare for three different classes during that term and (2) a general preference for teaching classes on Monday and Wednesday instead of Tuesday and Thursday.[69]

Overall, however, Klein was satisfied with her teaching schedule for eight of the last ten semesters.[70]

B.      *Office Assignment*

In 2003, Klein's department began a two-phase office move from the Tisch building to the KMC building, the second phase of which was completed in 2006.[71]  Dontoh was responsible

---

[66]

*Id.* at 168:10-25; 174:6-16.

[67]

*Id.* at 171:3-14.

[68]

*Id.* at 170:4-17.

[69]

*Id.* at 170:21-171:14, 172:15-20.

[70]

*Id.* at 165:9-174:24.

[71]

Dontoh Decl. [DI 44] ¶ 6.

for office assignments for the KMC office space.  He used the same layout for office assignments that existed in Tisch with the exception of the chair and the director of the Ross program, who received corner offices.[72]

Klein was scheduled to move from Tisch to KMC during the first phase.  Upon receiving her KMC office assignment, she refused to accept it.  Dontoh thereupon gave Klein his assigned office and took hers.  He remained in the office that initially had been assigned to Klein until the second phase of the move.[73]

When the second part of the renovation was complete, Klein asked for an office reassignment because the second phase offices were larger, received more light, and had better views, but Dontoh denied her request.[74]  He did, however, reassign professors who had been unhappy with their 2003 assignments but had not refused them to different offices in the second phase.[75]

C.    *Residential Housing*

Klein and her family long have resided in university housing in a two-bedroom apartment.  In April 1995, she requested a three-bedroom apartment because she  planned to (and

---

[72]    *Id.* ¶ 7.

[73]    *Id.* ¶ 8.

[74]    *Id.* ¶ 9.  Pl. Dep., at 210:17-20.

[75]    Dontoh Decl. ¶ 9.

later did) have a second child.[76]  She made a similar request approximately three years later while pregnant with her second child, asking for a three-bedroom apartment or, in the alternative, to combine her two-bedroom apartment with the subleased studio apartment  next door, which would have created a three-bedroom apartment.[77]  For the next eleven years, Klein continued to request a larger apartment or another arrangement that better would have accommodated her increased family size.  Klein was informed each time that her request was under consideration, that the housing situation was extremely tight, and that it was not possible to combine the two apartments.[78]

In 2009, NYU offered Klein a three-bedroom apartment.  Klein rejected the offer because, in her view, the apartment was "inferior" in size, finishing, appliances, and the bathroom to her two-bedroom apartment.[79]  At or around the same time, NYU offered Klein another housing option, a variation on one of her previous requests, *viz.* to rent (but not combine with) the studio apartment adjacent to her current apartment.[80]  Klein declined that offer as well.[81]

## *Discussion*

Klein claims that NYU discriminated against her because of her gender by (1)

---

[76]  Pl. Dep., Ex. 30.

[77]  *Id.* Exs. 31, 32.

[78]  *See id.* Exs. 33, 34, 36-38.

[79]  Pl. Decl. ¶ 16; Pl. Dep., at 239:23-242:8.

[80]  Pl. Dep., at 242:21-243:12.

[81]  *Id.*

denying her 2001 application for promotion to full professor, (2) not awarding her faculty fellowships or research professorships, (3) assigning her unreasonable and unfavorable teaching schedules, (4) denying her requests for different offices, (5) denying her requests for a three-bedroom apartment, (6) giving her unfavorable performance evaluations in 2004 and 2005, (7) giving her an unfavorable senior faculty peer review committee report, (8) denying her request to teach a Ph.D. level course, (9) asking her to resign, (10) not promoting her to full professor until her second application in 2009, and (11) paying her less than similarly situated male faculty members.

NYU contends that Klein has not made out a *prima facie* case of employment discrimination because she has not offered evidence of an adverse employment action within the period for which the statute of limitations has not run.  It argues also that Klein's equal pay claim would fail, even if she had made out a *prima facie* case, because any differences in salary can be explained by merit and factors other than gender.

I.      *Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[82]  The Court must view the facts in the light most favorable to the nonmoving party,[83] and the moving party has the burden of demonstrating the

---

[82]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *see also* FED. R. CIV. P. 56(c).

[83]    *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir.1997).

absence of a genuine issue of material fact.[84]  Nevertheless, where the burden of proof at trial would

fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence

to go to the trier of fact on an essential element of the nonmovant's claim.[85]  In that event, the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of

fact for trial in order to avoid summary judgment.[86]

Summary judgment in an employment discrimination case may be appropriate if the

plaintiff's claims rest "on conclusory allegations of discrimination and the employer provides a

legitimate rationale for its conduct."[87]  As  the Second Circuit has stated further "the salutary

purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less

in discrimination cases than to commercial or other areas of litigation."[88]

II.     *Disparate Treatment Claims*

It is unlawful for an employer to discriminate against an employee because of the

---

[84]

See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

[85]

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin At. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[86]

*See, e.g.*, *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

[87]

*Tojzan v. New York Presbyterian Hosp.*, No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *4 (S.D.N.Y. Mar. 31, 2003).

[88]

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

employee's race, color, religion, sex, or national origin.[89]  In New York, claims brought pursuant to Title VII must be filed with the EEOC within 300 days after the alleged adverse employment action.[90]  "This statutory requirement effectively acts as a statute of limitations, and Title VII claims are barred by the failure to file a timely charge."[91]

The Court considers Klein's disparate treatment claims under the familiar *McDonnell Douglas* framework.  The plaintiff first must make out a *prima facie* case of discrimination.  If the plaintiff succeeds, the burden of production shifts to the defendant, which must articulate a legitimate, non-discriminatory reason for taking any adverse employment action.  If the defendant carries that burden, the burden shifts back to the plaintiff to adduce, at the third step, admissible evidence sufficient to support a finding that the defendant's proffered and legitimate reason is in fact pretext for unlawful discrimination.[92]  The plaintiff bears the ultimate burden of persuading the trier of fact that defendant intentionally discriminated.[93]

To make out a *prima facie* case of discrimination, the plaintiff must offer evidence that if believed, would demonstrate that: (1) she was a member of a protected class, (2) she was qualified for the position held, (3) she was subject to an adverse employment action, and (4) the

---

[89]

42 U.S.C. § 2000e-2(a)(1).

[90]

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10, 122 S.Ct. 2061, 2070 (2002); *Hill v. Citibank Corp.*, 312 F.Supp.2d 464, 472 (S.D.N.Y. 2004).

[91]

*Hill*, 312 F.Supp.2d at 472 (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir.1996)).

[92]

*See Holcomb v. Iona Coll.*, 521 F.3d 130, 138, 141 (2d Cir. 2008).

[93]

*Leibowitz v. Cornell University*, 584 F.3d 487, 498-99 (2d Cir. 2009).

adverse employment action occurred in circumstances giving rise to an inference of discrimination.[94]

An adverse employment action is a "materially adverse change in the terms and conditions of employment" that "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."[95]   Termination, demotion evidenced by a decrease in earnings, a less distinguished title, a material loss of benefits, significantly decreased material responsibilities, or other indicators unique to a particular employment context may constitute an adverse employment action.[96]   Not every action that is perceived negatively by an employee is a materially adverse change in the terms and conditions of employment.

In this case, Klein has failed to make out a *prima facie* case of discrimination. Several of the actions of which Klein complains are time-barred, including her allegation regarding NYU's failure to promote her to full professor in 2001.  The actions that do fall within the applicable limitations period do not satisfy the third element because they were not adverse employment actions.  Even if they were, there is no evidence that they occurred in circumstances giving rise to an inference of discrimination.  The Court addresses each below.

A.   *Time-Barred Events*

Klein filed her charge of discrimination with the EEOC on April 17, 2006.  She therefore may not obtain relief for actions that occurred more than 300 days prior to that filing, i.e.,

---

[94]

   *Id.* at 498-99.

[95]

   *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks omitted).

[96]

   *Leibowitz*, 584 F.3d at 499 (quoting *Galabya*, 202 F.3d at 640).

before June 21, 2005.[97]  Accordingly, Klein concedes that she may not obtain relief with respect to the alleged (1) denial of promotion in 2001, (2) failure to receive a faculty fellowship or research professorship in 2001 and 2004, (3) unfavorable senior faculty peer review report, (4) request to resign in 2005, and (5) unfavorable faculty review for the 2004-2005 academic year, even if each of those events otherwise would have been actionable.[98]

      B.     *Failure to Promote*

      Klein contends that NYU discriminated against her by dissuading her in 2007 from applying for promotion to full professor and not promoting her until she applied for promotion again in 2009.  To make out a *prima facie* case of discriminatory failure to promote, the plaintiff must offer evidence that if believed, would establish "that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion."[99]

      Klein applied for promotion to full professor on two occasions, once in 2001 and again in 2009.  Any claim for relief with respect to Klein's 2001 application is time-barred for reasons explained above.  When Klein applied for promotion again in 2009, she was promoted to full professor.

      Klein argues that she should have been promoted in 2007, along with Ryan and

---

[97]

      Such conduct may be considered to whatever extent it bears on whether later events reflected discrimination.

[98]

      Pl. Mem. [DI 51] at 7.

[99]

      *Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998)) (internal quotation marks omitted).

Zarowin.  She asserts that Choi suggested that she not apply for promotion because of "the pervasive attitude and history of sex discrimination in the Department meant that her chances of being promoted at the same time two male candidates were under consideration for promotion were remote."[100]  There is no evidence, however, that Choi's suggestion that Klein wait to apply for promotion was motivated by gender animus.  To the contrary, Choi testified that he advised Klein to wait based on his own personal judgment because her likelihood of success would be much higher if she did not apply at the same time as two other associate professors.[101]  In their conversation, he cited the increasingly tough standards for tenure and promotion that were being applied by the new administration at the University.[102]  In addition, Klein testified that Choi, after becoming chair of the department, was supportive of her efforts to be promoted and did not discriminate or retaliate against her in any way in connection with her promotion.[103]  She testified also that Professor Ingo Walter, who became the vice dean of faculty in 2008, never discriminated or retaliated against her and was supportive of her promotion.[104]

     As there is no evidence that Choi or others dissuaded Klein from applying for promotion with a discriminatory intent, Klein has not made out a claim for failure to promote.  The only actual application for which relief is not time-barred was granted.

---

[100]     Pl. Mem. at 8.

[101]     Choi Dep., at 19:13-20:3.

[102]     *Id.* at 20:4-21:15.

[103]     Pl. Dep., at 260:18-261:10.

[104]     *Id.* at 261:14-24.

C.    *Denial of Housing Request*

Klein asserts that NYU repeatedly denied her requests for a three-bedroom apartment or other similar accommodation to her university-subsidized housing.  NYU disagrees, arguing that there is no evidence that the denial of Klein's requests impacted the terms and conditions of her employment, that she refused new housing options when they were offered in 2008 and 2009, and in any event, that there is no evidence that similarly situated male professors received housing benefits when Klein did not.

An adverse employment action must involve a "materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience."[105] Courts have offered several examples of an adverse employment action, among them being a loss of material benefits.[106] An adverse employment action, however, may be based on other indicators that are unique to a particular employment context.[107]

In Klein's case, the Court accepts *arguendo* that denial of her request for a third bedroom, in the context of academia and the New York real estate market, could be found to be an adverse employment action.  There is significant value associated with a third bedroom, and university-subsidized housing has been part of the terms and conditions of Klein's employment for nearly all of her career at Stern.  But that does not get Klein where she wants to go.

Klein has offered no evidence sufficient to show that her request was denied in

---

[105]     *Galabya*, 202 F.3d at 640.

[106]     *See Leibowitz*, 584 F.3d at 499 (quoting *Galabya*, 202 F.3d at 640).

[107]     *See id.*

circumstances giving rise to an inference of discrimination.  Although Klein repeatedly was told that there was limited availability of three-bedroom apartments in the University housing system as a basis for the denials of her requests,[108] there is no evidence that those explanations were false or that the denials were based on gender.   Even Klein acknowledged in one of her earlier requests that the supply of three-bedroom apartments in the NYU housing was tight.[109] By her own admission, she was in a "queue with several others in similar circumstances" waiting for the availability of larger apartments.[110]  She has offered no evidence that male faculty members behind her in the queue were offered three-bedroom assignments before Klein was.

D.      *Klein's Other Claims*

Klein alleges also that she was a victim of disparate treatment in that she (1) received negative performance evaluations, (2) was not awarded faculty fellowships or research professorships, (3) was assigned an unfavorable teaching schedule, and (4) received a poor office assignment.  The same standards that apply to her promotion and housing claims are applicable here.

As the parties agree that Klein was a member of a protected class and was qualified to be an associate professor, only the third and fourth elements of a *prima facie* case are at issue – whether Klein was subjected to an adverse employment action and whether any such action occurred in circumstances giving rise to an inference of discrimination.

Klein acknowledges that some of her remaining claims rest on actions that seem to

---

[108]
 *See* Pl. Dep., Exs. 32, 34, 37.

[109]
 *Id.* Ex. 31.

[110]
 *Id.* Ex. 34.

be "trivial slights or inconveniences when considered alone."[111]  She argues, however, that "taken together, in the unique setting of academia," her claims rest on adverse employment actions.[112]

Although the remaining actions may have posed more than a mere inconvenience, at least subjectively, she has not offered evidence that would permit a finding that her claims rise – either individually or collectively – to the level of a material alteration of job status or responsibilities such as termination, demotion, or some other material loss of benefits.  Nor has Klein offered any evidence demonstrating that these events occurred in circumstances giving rise to an inference of discrimination.

The Court addresses each below.

### 1.   *Performance Evaluations*

Klein asserts that she received performance evaluations in 2005[113] and 2006[114] that negatively impacted her annual merit increases.  She complains also about her 2005 Senior Faculty Peer Review Committee report.

Klein received the 2005 evaluation before June 21, 2005, so it concededly cannot be the subject of relief.  The Peer Review Committee report did not impact her salary or other

---

[111]    Pl. Mem. at 9-10.

[112]    *Id.*

[113]    Pl. Dep., Ex. 50.

[114]    *Id.* Ex. 52.

benefits.[115]  What remains to be considered, then, is whether Klein's 2006 evaluation was an adverse employment action occurring in circumstances giving rise to an inference of discrimination.

A negative performance evaluation must impact the terms and conditions of employment to be considered an adverse employment action.[116]  A plaintiff must "proffer objective indicia of material disadvantage" from a performance evaluation.[117]  "[S]ubjective, personal disappointment" alone will not satisfy this requirement.[118]

Klein's 2006 evaluation recognized her notable publication and her AAA award from the prior year.  It noted also her improved teaching ratings and increased involvement in activities both inside and outside of Stern.  She received (1) a salary increase of 5.36 percent, which was greater than the 3.00 percent raise that she had received the year before, and (2) summer research support equal to two-ninths of her annual salary.  She has offered no evidence that this performance evaluation materially disadvantaged her in any way. To the contrary, it led to material benefits, including a raise and summer research funding.  Thus, Klein's 2006 evaluation was not an adverse

---

[115]

The senior faculty peer review process provides faculty with recommendations and feedback on their performance that is separate from the "management structure."  Backus Dep. at 98:13-18.  The committee reviews faculty members, like Klein, who have been an associate professor for ten or more years.  Pl. Dep., Ex. 60.  The faculty member has an opportunity to comment and meet with the committee after a preliminary review is complete.  *Id.*  Klein received the draft report, provided written comments, and the committee later issued its final report.  There is no evidence that the committee's report impacted Klein's salary or any other material benefit.

[116]

*Sanders v. N.Y. City Human Resources Admin.*, 361 F.3d 749, 756 (2d Cir. 2004).  *See also Lawrence v. Mehlman*, 389 Fed.Appx. 54, 56 (2d Cir. 2010).

[117]

*Beyer v. County of Nassau*, 524 F.3d 160, 163-64 (2d Cir. 2008) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)) (internal quotation marks and brackets omitted).

[118]

*Id.*

employment action.

Even if the 2006 evaluation had been an adverse employment action, there is nothing from which to infer that it reflected any invidious discrimination.  Klein's highest rating was in the research category – the category over which her department chair had the most control. Her overall evaluation was hurt by student course evaluations and her own limited participation in activities both inside and outside of Stern.

2.    *Failure to Receive Faculty Fellowships or Research Professorships*

Klein maintains that she was not selected for a faculty fellowship or research professorship, an award or position that would have included a more prestigious title and guaranteed additional support for multiple years.  But, like Klein's negative performance evaluation claim, this claim cannot be considered in isolation.

In the period for which the statute of limitations has not run, Klein was nominated for, but was not awarded, a faculty fellowship in 2007.  She asserts further that she was not given other research funds when they became available in 2006 and 2008.  During this same period, however, Klein received summer research support, the equivalent of two-ninths of her salary – the same amount that she would have received as a faculty fellow or research professor.  That summer research support, although not awarded with a three-year guarantee as with a faculty fellowship or research professorship, was renewed each year.  Thus, Klein received the same economic benefits that she would have received if she had been selected for a faculty fellowship or research professorship.  The only difference was a title, and there is no evidence that the lack of the title

materially impacted Klein's conditions of employment.[119]


### 3.      Teaching Schedule

Klein contends that she received unfavorable teaching schedules and was not allowed to teach a Ph.D.-level course.  Her claim relies on schedules for only two semesters over a lengthy career at Stern. She argues that the schedules were unfavorable due to the timing and student composition of the courses.

A university professor's dissatisfaction with course assignments when he or she "does not allege any resulting loss in wages" is not an adverse employment action.[120]  Klein has not offered any evidence that the aspect of her teaching schedule of which she complains impacted her compensation or other material benefits.  Thus, her course assignments and the composition of her classes cannot be considered adverse employment actions.

Klein's allegations regarding a Ph.D.-level course are insufficient on the same ground.  Ph.D.-level courses at Stern are considered part of a professor's regular teaching load. A faculty member does not receive a salary increase for teaching such a course unless it exceeds his or her regular teaching load.[121]  The failure to assign such a course to Klein therefore could not be found to be an adverse employment action.

---

[119]
    It should be noted that despite the fact that Klein did not receive a faculty fellowship or research professorship, Klein received offers from at least two other universities offering a substantial increase in salary and an opportunity to run a research institute presumably on the basis of her record at Stern.

[120]
    See Boise v. Boufford, 121 Fed.Appx. 890, 892-93 (2d Cir. 2005).

[121]
    Bartov Dep. [DI 42-14], at 15:14-16:9.

Even if Klein's discontent with her teaching schedule were an adverse employment action, there is no evidence that her assignments were made in circumstances giving rise to an inference of discrimination.  To the contrary, Dontoh, granted Klein's request not to teach morning classes to allow her to take her children to school.  She testified that, on at least one other occasion, Dontoh was "very accommodating" in addressing her concerns regarding her teaching schedule.[122]

### 4. *Office Assignment*

Finally, Klein asserts that she received an unsatisfactory office assignment when the department moved from the Tisch building to the KMC building.  Offices in the new building, however, were assigned in the same configuration that existed in the previous building with two exceptions based on seniority.  When Klein, expressing her dissatisfaction with her assignment like several other professors, flatly refused to accept her assignment, Dontoh gave Klein his own office. Klein maintains still that given her initial dissatisfaction and the higher quality of other offices, she should have been given a new assignment.

Undesired office assignments are not adverse employment actions.[123]   Klein's dissatisfaction with her office assignment is nothing more than an everyday workplace grievance. She has not made out a *prima facie* case based on the facts alleged.

---

[122]

Pl. Dep., at 187:9-25.

[123]

*See Cunningham v. N.Y.S. Dep't of Labor*, 326 Fed. Appx. 617, 619-20 (2d Cir. 2009); *Stoddard v. Eastman Kodak Co.*, 309 Fed. Appx. 475, 479 (2d Cir. 2009).

### III.    Retaliation Claims

Klein alleges also that many of the actions referred to above were taken in retaliation for her signing of the 1998 Memo and filing her EEOC charges and this lawsuit.

The Court considers retaliation claims under the same *McDonnell Douglas* burden shifting framework.  The elements of a *prima facie* case differ.  The plaintiff must show that (1) she participated in a protected activity, (2) the employer was aware of her participation, (3) she suffered a materially adverse action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," and (4) a causal connection between the protected activity and the materially adverse action.[124]  The standard for a materially adverse action for a retaliation claim is not the same as that for a disparate treatment claim – a materially adverse action need not affect the plaintiff's terms and conditions of employment.[125]  In the retaliation context, the Supreme Court has adopted an objective standard based on the hypothetical reasonable employee.[126]  Nevertheless, "petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation."[127]  "The antiretaliation provision protects and individual not from all retaliation, but from retaliation that produces an injury or harm."[128]

---

[124]

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[125]

*Id.* at 61-67 (discussing the Title VII anti-retaliation provision).

[126]

*Id.* at 68-69.

[127]

*Hicks v. Baines*,  593 F.3d 159, 165 (2d Cir. 2010) (quoting *White*, 548 U.S. at 68) (internal quotation marks omitted).

[128]

*White*, 548 U.S. at 67.

A.      *Time-Barred Claims*

Several of the alleged acts of retaliation are not eligible for relief.  The same statute of limitations for Klein's disparate treatment claims applies here. Therefore, relief with respect to the following allegations is time-barred:  (1) denial of promotion in 2001, (2) failure to receive a faculty fellowship or research professorship in 2001 and 2004, (3) unfavorable senior faculty peer review report, (4) request to resign in 2005, and (5) unfavorable faculty review report for the 2004-2005 academic year.

B.      *The Remaining Claims*

The Court assumes that Klein participated in protected activities – signing the 1998 Memo and filing EEOC charges and this lawsuit – and that NYU was aware of her participation in all of the activities.  Only the third and fourth elements of a *prima facie* case for retaliation are at issue for each of the remaining claims.

1.      *Failure to Promote*

Klein asserts, based on the same facts as her disparate treatment claim, that NYU retaliated against her by not promoting her until 2009.  Her own deposition testimony, however, undermines her position.  Klein testified that Choi was supportive of her promotion process and did not retaliate or discriminate against her in any manner.[129]  Moreover, Klein testified that she was treated "more equally" as a result of filing her lawsuit.[130]  Thus, there is no evidence from which to

---

[129]        Pl. Dep., at 260:18-261:10.

[130]        *Id.* at 262:2-7.

conclude that Klein suffered a materially adverse action.

Even assuming *arguendo* that Klein's promotion process could be considered to have been materially adverse, there is no evidence to support a causal connection between the protected activities and the promotion-related advice that Choi gave Klein.  The evidence that is available indicates that other female professors who signed the same memorandum later received promotions and went on to have successful careers at Stern.[131]

### 2.   *Remaining Claims*

In addition to delaying her promotion, Klein alleges that NYU retaliated against her by assigning an unfavorable office and teaching schedules and denying her residential housing requests. These remaining claims are not materially adverse actions in the retaliation context.  Even if they were, there is no evidence of a causal connection between Klein's protected activities and those actions.

First, the fact that Dontoh did not reassign Klein to a new office is not a materially adverse action because there is no evidence that Klein was injured or harmed by not receiving better lighting or improved views.  Nor has Klein offered any evidence that Dontoh's assignment was in any way connected to the 1998 Memo or the events related to this lawsuit.

Second, Klein's mere dissatisfaction with her teaching schedule is not sufficient to support a finding of a material adverse action.  Faculty members, both male and female, objected

---

[131]  Four of the five faculty members still teaching at Stern were promoted to full professor after signing the 1998 Memo, and the fifth faculty member was a full professor at the time that the memo was signed.  Almost all of the women have served as heads of academic programs at Stern.  The remaining female faculty members have been awarded faculty fellowships and research professorships, and at least one of the women has an endowed chair.

to their schedules, and even Klein was satisfied for eight of the last ten semesters.  Such dissatisfaction would not dissuade a reasonable employee from bringing a charge of discrimination. Moreover, there is no evidence of injury or harm beyond Klein's assertion that teaching on Thursday evening during one semester limited her travel schedule for presentations nor evidence of a causal connection between the course assignments and her protected activities.

Finally, even assuming that denial of Klein's housing requests were materially adverse actions, there is no evidence supporting a causal connection between Klein's protected activity and NYU's refusal to offer Klein a three-bedroom apartment.  The evidence indicates simply that there has been an extremely tight market for three-bedroom apartments in the university housing system, Klein was under consideration along with other similarly situated professors for a housing upgrade, and she was provided with additional housing options when they became available.

Even considering Klein's claims in aggregate, she fails to offer evidence of a materially adverse action that is causally connected to her protected activities.  Klein may not have been satisfied with aspects of her employment at NYU, but dissatisfaction alone is not sufficient to allege a material adverse action for retaliation.  Klein has failed to make out a *prima facie* case for retaliation.

IV.     *Equal Pay Act*

Finally, Klein alleges that she was underpaid relative to three male accounting professors: Bartov, Ryan, and Zarowin (the "comparators") in violation of the Equal Pay Act.[132]

---

[132]    Klein's original claim included a comparison to Professor Joshua Livnat.  For the purposes of this motion, Klein limited her comparison to Bartov, Ryan, and Zarowin.  Pl. Mem. at 19 n.2.

NYU argues that the comparators are not appropriate because Klein did not perform equal work in a job requiring equal skill, effort, and responsibility.  Klein, however, maintains that her research, publication record, student evaluations, and outside service is comparable to, if not stronger than, that of the comparators.

To make out a *prima facie* case of discrimination under the EPA, a plaintiff must show that the (1) employer paid lower wages to employees of the opposite sex, (2) the relevant employees performed "equal work on jobs the performance of which requires equal skill, effort, and responsibility," and (3) the jobs were performed in similar working conditions.[133]   A plaintiff need not "demonstrate that her job is identical to a higher paid position" as long as she can show that the two positions are "substantially equal."[134]  Nor is the plaintiff required to prove discriminatory intent.[135]   Hence, under the EPA, a showing of a *prima facie* case creates a presumption of discrimination.[136]   Once a *prima facie* case is established, the burden shifts to the defendant to demonstrate that the pay differential was justified by either a (1) seniority system, (2) merit system, (3) system which measures earnings by quantity or quality of production, or (4) any factor other than gender.[137]   If the defendant uses the "any factor other than gender" defense, it must show a

---

[133]

29 U.S.C. § 206(d)(1); *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999).

[134]

*Lavin-McEleney v. Marist College*,  239 F.3d 476, 480 (2d Cir. 2001) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 (1998)).

[135]

*Belfi*, 191 F.3d at 136.

[136]

*Id.*

[137]

*Id.*

"legitimate business reason" for the pay disparity.[138]  The plaintiff then "may counter . . . by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination."[139]

Klein has made out a *prima facie* case under the EPA.  Klein was paid less than each of the comparators.[140]  The evidence would permit a conclusion that they all performed the same job requiring substantially equal skill, effort, and responsibility in similar working conditions as professors in the same department.  Although all of the comparators were promoted from associate professor to full professor before Klein, a reasonable jury could find that the skill and effort required to do their work was substantially the same.

NYU asserts that the pay disparity can be explained by seniority or merit.  Through the declaration of Professor Walter, NYU offers evidence of its compensation policy along with the professional records of Klein and the comparators.  Klein argues that Walter's declaration is insufficient and should be rejected as speculation because Walter had no role in or knowledge of

---

[138]

    *Id.*

[139]

    *Id.*

[140]

    Bartov began working at NYU in 1992 earning slightly less than Klein.  Walter Decl. ¶ 20, Exs. 29, 31.  Bartov made $250 more per year than Klein in 1996.  *Id.* Exs. 29, 31.  The following year they both had an annual salary of $100,000.  *Id.*  He, however, was promoted to full professor in 2001 and received a significant salary increase.  *Id.* Ex. 31.  Beginning in 2004, Bartov was paid a higher salary based on his position as a research professor.  *Id.*

    Ryan joined NYU in 1990 earning more than Klein.  *Id.* Exs. 29, 32.  He received a significant increase in salary with his promotion to full professor in 2007.

    Klein earned more than Zarowin when she began her career at NYU.  *Id.* Exs. 29, 33.  Zarowin received a significant salary increase in 2007 following his promotion to full professor.

how merit increases were determined until 2008.

 In cases in which an employer uses established policy to justify a pay disparity, the Court "must focus on whether that policy has been used reasonably in the case at hand, in light of the employer's stated purpose for the policy and in light of the employer's other practices."[141]  One could imagine a case in which there is purely objective or quantitative evidence that offers a dispositive justification for differences in pay.  When that is not the case, the defendant must offer evidence of how the established policy or stated criteria was applied.

 NYU does not use purely objective or quantitative evidence to determine faculty raises.  Rather, half of a professor's evaluation depends on subjective assessments of his or her research, publication record, and what qualifies as a top-tier journal.  The other factors taken into consideration arguably are evaluated selectively including student evaluations and service and leadership both inside and outside of Stern.   The faculty activity reports and resumes of Bartov, Ryan, and Zarowin may demonstrate that they had publication records that differed from Klein's or other attributes, warranting higher salary increases.   But Walter's declaration alone is not sufficient to rule out Klein's theory that she would have received comparable pay but for her gender.  He was not involved in deciding merit increases until 2008, and there is no other evidence about how merit increases actually were determined.  This issue therefore cannot be decided on the current record.

---

[141]

 *Belfi*, 191 F.3d at 139 (citing *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526 (2d Cir.1992)).

*Conclusion*

For the foregoing reasons, the defendant's motion for summary judgment [DI 41] is granted to the extent that all of the plaintiff's claims, except for her Equal Pay Act claim, are dismissed.

SO ORDERED.

Dated:      March 31, 2011
Corrected:  April 1, 2011

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)